# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 18-03097-01-CR-S-MDH |
| **KEITH FRASER NOBLE,** | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1.     **The Parties.**  The parties to this agreement are the United States Attorney's Office for the Western District of Missouri, represented by United States Attorney Timothy A. Garrison and Assistant United States Attorney Steven M. Mohlhenrich (otherwise referred to as "the Government" or "the United States"), and the defendant, Keith Fraser Noble ("the defendant"), represented by Teresa Grantham Fiester, Esq.  The defendant understands and agrees that this plea agreement does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement or any addendum thereto.

2.     **Defendant's Guilty Plea**.  The defendant agrees to and hereby does plead guilty to the single-count Information, charging him with a violation of **18 U.S.C. § 4**, that is, **Misprision of Felony**.  By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is, in fact, guilty of the offense.

3.     **Factual Basis for Guilty Plea.**  The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

    A.    <u>Persons and Entities</u>

Preferred Family Healthcare, Inc. ("PFH") was a Missouri nonprofit corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri. PFH and its subsidiaries provided a variety of services to individuals in Missouri, Arkansas, Kansas, Oklahoma and Illinois, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services. Originally, and for most of its existence, PFH was known as Alternative Opportunities, Inc. ("AO"), a Missouri nonprofit corporation formed on December 3, 1991, and headquartered at 1111 South Glenstone Avenue, in Springfield, Missouri. Effective May 1, 2015, AO merged with Preferred Family Healthcare, Inc., of Kirksville, Missouri, with the merged entity (the "Surviving Corporation") retaining the PFH name and corporate charter. (Hereinafter, "the Charity" shall refer to the entity known as Preferred Family Healthcare, Inc., after April 30, 2015, and Alternative Opportunities, Inc., prior to May 1, 2015.)

Most of PFH's funding was from appropriated federal funds—the largest portion of that being Medicaid reimbursement. For the fiscal years 2005 through 2017, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received annually at least $10,000 in funds from the Federal government, more particularly, the Departments of Health and Human Services ("HHS"), Labor ("DOL"), Veterans Affairs ("VA"), Housing and Urban Development ("HUD"), Justice ("DOJ"), Agriculture ("USDA"), and Education ("DoED") under programs involving grants, contracts, loans, guarantees, insurance, and other forms of federal assistance.

The defendant, Keith Fraser Noble ("NOBLE") a resident of Springfield, and Rogersville, both in the Western District of Missouri, was a Licensed Psychologist and Certified Substance Abuse Counselor. NOBLE was a consultant for the Charity before joining the Charity in 1994, and thereafter held the position of Director of Clinical Services until 2014 or 2015 when his title was changed to Chief Clinical Officer ("CCO"). NOBLE was responsible for overseeing clinical operations and the provision of services, quality control matters, and assisting in drafting the Charity's grant proposals involving clinical and medical grants.

"Person #1," a resident of Springfield, Missouri, and Boulder, Colorado, was one of the original founders of the Charity. Person #1 was the Charity's Chief Financial Officer ("CFO"), and had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

"Person #2," a resident of Springfield, Missouri, and Boulder, Colorado, began working for the charity in 1994. Person #2 was the Charity's Chief Operating Officer ("COO"), and served as the chief administrator over personnel in all

programs and services. Person #2 had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity, and was commonly recognized as the "boss" of the Charity.

"Person #3," a resident of Springfield, Missouri, began working at the charity in 1992. Person #3 was the Charity's Chief Executive Officer ("CEO"), and oversaw the Charity's lobbying and governmental affairs activities. Person #3 had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

The term "Resource Team," often abbreviated "RT," was used within the Charity to refer to the Charity's highest level of executive leadership. The composition of the Resource Team changed slightly over time, but throughout the period relevant to this Information, the RT included Person #1, Person #2, Person #3, and NOBLE.

David Carl Hayes ("Hayes"), charged elsewhere, was a resident of Springfield, Missouri, and held a license from the state of Missouri as a Certified Public Accountant ("CPA") from 1988 until 2006, when he allowed his CPA license to expire. From 2006 to 2013, Hayes was the coordinator of merger and acquisition activity for the Charity. From 2006 to 2011, Hayes served as a member of AO's Board of Directors. From 2011 to 2013, Hayes was the Charity's internal auditor.

Milton Russell Cranford, also known as "Rusty" Cranford ("Cranford"), charged elsewhere, was a resident of Rogers, Arkansas and lobbyist registered with the Arkansas Secretary of State. Beginning in 2007, upon the Charity's acquisition of Dayspring Behavioral Health Services, Cranford also was an employee of the Charity, serving as its executive overseeing company operations in the state of Arkansas. Also, Cranford operated three lobbying firms: The Cranford Coalition, The Capitol Hill Coalition, and Outcomes of Arkansas.

Eddie Wayne Cooper ("Cooper"), charged elsewhere, was an Arkansas State Representative from 2006 through January 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011, onward. On April 20, 2009, the Charity hired Cooper as a full-time employee, with the job title of "Regional Director." Cooper's employment with the Charity ended on April 26, 2017. From October 2009 through April 2015, Cooper also was a member of AO's Board of Directors. Cooper also worked for The Cranford Coalition as a lobbyist, and received payments from The Cranford Coalition as a contract employee.

Donald Andrew Jones, also known as "D.A." Jones ("Jones"), charged elsewhere, was a resident of Willingboro, New Jersey, and a Philadelphia, Pennsylvania-based political operative. Jones owned and operated the firm, D.A.

3

Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

"Entity A" was a Missouri limited liability company ("LLC") that was used as the management company for AO. Entity A was formed in 1995 by Person #1, Person #2, Person #3, NOBLE, and three of their associates. In 2006, Entity A was sold to "Company A," a publicly-traded corporation, by its five remaining owners: Person #1, Person #2, Person #3, NOBLE, and Person #15; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

"Entity B" was a Missouri LLC formed in 2005, and owned by Person #1, Person #2, Person #3, NOBLE, and one other person. Immediately prior to the 2006 sale of Entity A to Company A, Entity B acquired title to all real estate formerly held by Entity A.

"Entity C" was a Missouri LLC formed in 2007, and owned by Person #1, Person #2, Person #3, NOBLE, and Entity B. Entity C held the title to the building located at 1111 Glenstone Avenue, in Springfield, Missouri, which was the corporation's headquarters, and duplex homes located on Olive Street, in Springfield, Missouri.

"Entity D" was an Arkansas LLC formed in 2009, and owned by Person #1, Person #2, Cranford, Hayes, and "Employee E" (who was then the Charity's in-house legal counsel). The Charity paid rent to Entity D for the use of various properties, including offices, and clinics.

"Entity E" was a Missouri S-corporation that was in the business of re-packaging and selling indoor thermostats imported from China. Entity E was formed in 2006, using funds Person #1 and Person #2 received from the sale of Entity A to Company A. Person #1 and Person #2 owned a combined 45.1086 percent share of Entity E, and a relative of Person #2 owned another 45.1086 percent.

Dayspring Behavioral Health Services ("Dayspring") was an Arkansas limited liability company providing behavioral health services, which was acquired by AO in 2007 and thereafter continued as a business alias of the Charity. Doing business as Dayspring, the Charity operated dozens of clinics throughout the state of Arkansas, offering a variety of behavioral health services to individuals, families, and groups.

Case 6:18-cr-03097-MDH   Document 10   Filed 09/11/18   Page 4 of 28

B.  <u>Restrictions on Political Activity by Recipients of Federal Grants</u>

Recipients of Federal contracts, grants, loans, and cooperative agreements, were prohibited by law from expending appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

As a prerequisite for making or entering into any Federal contract, grant, loan, or cooperative agreement, Title 31, United States Code, Section 1352, required the applicant/recipient to agree to follow the lobbying restrictions in accordance with Title 29, Code of Federal Regulations, Part 93—Appendix A, and to certify that:  (a)  No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement; and (b) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or a cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

The above certifications were material representations upon which Federal agencies, and State agencies disbursing Federal funds, relied in determining whether the recipients were eligible to receive Federal funds, and that they spent those funds in accordance with the law.

C.  <u>Felony Cognizable By Courts of the United States</u>

From a date unknown, but at least as early as 2005, until on or about June 30, 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, Person #1, Person #2, Person #3, and—from 2007 onward—Cranford, conspired and agreed with each other, and with others known and unknown to the United States, to commit the following crimes, in violation of Title 18, United States Code, Section 371:  Person #1, Person #2, Person #3, and others known and unknown, being agents of the Charity, an organization receiving in each

5

one-year period from July 1, 2005, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly misapplied and converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, that is, millions of dollars in funds; in violation of Title 18, United States Code, Section 666(a)(1)(A).

The manner and means by which the conspirators achieved and attempted to achieve the objects of the conspiracy included but were not limited to the following:

> *i.   The conspirators caused the Charity to pay unnecessary and excessive "management fees" to Entity A, and structured the sale of Entity A to Company A so as to unjustly enrich themselves, to the financial detriment of the Charity.*

In June 2005, the Resource Team, with the assistance of Hayes, who was then the Charity's coordinator of merger and acquisition activity, began negotiating the sale of Entity A to Company A, a publicly-traded corporation.  In July 2005, the conspirators caused the Charity to enter into a 10-year contract with Entity A.  The initial contract obligated the Charity to pay Entity A "management fees" of "up to 15%" of the Charity's gross revenue.  In November 2005, the conspirators caused the Charity to execute a five-month "consulting agreement" with Company A, obligating the Charity to pay Company A $200,000 per month, for a total of $1,000,000.  In February 2006, the conspirators caused the Charity to amend its management agreement with Entity A, to increase the management fee to exactly 15 percent of gross revenue.

In April 2006, the RT sold Entity A to Company A for the sum of $1,000,000, plus two "earn-outs," which were annual bonuses based on five times the net earnings of Entity A, before interest, taxes, depreciation, and amortization.  Earn-out #1, for April through December of 2006, was to be paid in U.S. currency.  Earn-out #2, for calendar year ("CY") 2007, was to be paid as 75% U.S. currency, and 25% in unregistered common stock of Company A.

Between April 26, 2006, and December 31, 2007, to maximize the amount of the RT's earn-out bonuses, the conspirators, aided and abetted by Hayes, embezzled and diverted additional funds from the Charity to Entity A by temporarily delaying recordation of Entity A expenses and instantly recording Charity gross revenues from newly acquired entities through mergers and acquisitions, artificially inflating both the Charity's "management fees" paid to Entity A, and Entity A's earnings.  Moreover, the conspirators caused the Charity to incur additional expenses through various business transactions, such as movement of personnel between organizations, and Entity A employees using the

Charity's corporate credit cards for expenses Entity A should have paid under the terms of the "management agreement." This, in turn, resulted in the RT's personal gain of five dollars in earn-out bonus for every dollar for which the conspirators delayed or omitted proper accounting by the Charity.

At the conclusion of the second earn-out period, the conspirators caused the Charity and Entity A to amend the management agreement to create a tiered management fee structure based upon net revenue—at 15% of the first $20 million, 10% of the next $10 million, and 5% of revenue exceeding $30 million.

The sale of Entity A to Company A caused no significant change to any Charity employee's rate of pay, scope of work, or physical location. After the sale, the RT retained full control over the Charity and its resources. The RT retained the ability to move employees back and forth between the entities, to include movement of RT members at will. Yet, from this set of interconnected transactions, which financially harmed the Charity, the RT received $17,624,155.

Moreover, Person #1 and Hayes misapplied and embezzled funds from the Charity to compensate Hayes for his assistance with the sale of Entity A to Company A, and for his work to maximize the amount of the earn-out payments. On February 7, 2007, Person #1, in his capacity as Managing Member of Entity B, signed an agreement with Hayes for his cooperation to increase the second earn-out payment from the sale of Entity A to Company A, under which Hayes was to be paid eight percent (8%) of the second earn-out, some of which was to be paid in advance. Despite the fact that the agreement was between Hayes and Entity B, payments for Hayes's services were made from and through "Entity J," a prior management company owned by Person #1, Person #2, Person #3, Person #15, and one other person who was no longer affiliated with the Charity, and all of those payments originated from the Charity.

Person #1 and Hayes caused the Charity to make payments to Hayes by way of Entity J. They recorded this embezzlement and misapplication of funds as "business development" in the Charity's accounting system, and Hayes created, and Person #1 authorized payment of, invoices from Entity J to the Charity, and from himself to Entity J, all describing the invoiced payments as, "progress billing relating to business development services." In CY 2008, Person #1 and Hayes misapplied and embezzled $566,250 of the Charity's funds for Hayes's benefit, in this manner.

> ii. *The conspirators caused the Charity to pay excessive amounts for leased vehicles to Entity B.*

Beginning as early as September of 1999, the conspirators caused the Charity to lease vehicles from Entity B (and the predecessor entity of Entity A),

which Entity B (and the predecessor entity of Entity A) in turn leased from "Company B," a Missouri C-corporation that was a fleet management affiliate of a national car rental company. As of 2011, the Charity paid Entity B a flat rate that varied per year for the use of the vehicles. From 2011 to 2014, the approximate average monthly cost to Entity B (paid to Company B) was $22,700. This resulted in the Charity's average monthly overpayment to Entity B for the vehicle leases of approximately $18,700, which inured to the benefit of its owners, Person #1, Person #2, Person #3, NOBLE, and Person #16.

> *iii.  The conspirators caused the Charity to lend funds to their for-profit companies, Entity A, Entity B, Entity C, and Entity J.*

Beginning as early as 2006, on numerous occasions, the conspirators caused the Charity to lend money to four of their for-profit companies: Entity B, Entity C, Entity D, and Entity J. These loans were non-interest bearing until February 2015, when an attempt was made to legitimize the transactions with the help of "Employee F." For each of these loans, significant time passed when no payments were made toward the balance. In the case of Entity B, a period of 30 months passed with a balance due to the Charity of $581,352, without any payments made or interest accrued. In the case of Entity C, 28 months passed with a balance due to the Charity of $123,395, with no payments made or interest accrued. In the case of Entity D, a period of 36 months passed where the balance grew steadily from $489,247.96 to $533,277.77. Entity D borrowed money from the Charity to make land improvements and down-payments for construction loans on buildings that Entity D then leased back to the Charity.

Prior to Employee F's February 2015 interest calculation, totaling $21,173.32, the conspirators' for-profit entities paid zero interest, despite the following amounts having been due to the Charity from those entities as of the end of each of the following fiscal years:

| Fiscal Year | Amounts Due |
|---|---|
| FY2006 | $    330,000 |
| FY2007 | $    330,000 |
| FY2008 | $    481,160 |
| FY2009 | $    422,355 |
| FY2010 | $    655,051 |
| FY2011 | $  1,216,995 |
| FY2012 | $  1,206,534 |
| FY2013 | $  1,220,731 |
| FY2014 | $  1,073,097 |
| FY2015 | $    481,160 |

This represented an underpayment of $4,751,521, based upon a conservative estimate of the interest that would have been charged if the loans had been obtained commercially, as set forth below.

| Company | Interest |
|---|---|
| Entity B (07/08–02/15) | $ 2,195,229 |
| Entity C (10/09–06/14) | $ 431,898 |
| Entity D (04/09–01/15) | $ 1,531,767 |
| Entity J (07/05–06/07) | $ 613,800 |
| (less amount paid) | ($ 21,173) |
| **Total:** | **$ 4,751,521** |

     *iv. The conspirators caused the Charity to pay rent to Entity B and Cranford for various recreational properties.*

From 2010 through 2015, the conspirators caused the Charity to pay a total of $1,496,600 to Entity B for rental real estate unrelated to the Charity's mission, which rent payments inured to the benefit of Person #1, Person #2, Person #3, NOBLE, and one other, for the real estate described below.

    a. From an unknown date through 2010, the Charity rented the property referred to by the conspirators, and others at the Charity, as "the Dog House," located at 1843 County Road 965, in Green Forest, Arkansas, which was owned by Entity B. The property consisted of a 3,196 square foot home on a 6-acre lot, with an additional building that included a guest house and garage.

    b. From at least 2010 through May 2015, the Charity rented the property referred to by the conspirators, and others at the Charity, as "the Mountain House," located at 103 Highway Cir #1754, in Compton, Arkansas, which was owned by Entity B. The property consisted of a 590-acre property, with a 1,920 square foot house, a small cabin, a large shop building, a horse stable, and multiple ponds.

    c. From at least 2010 through May 2015, the Charity rented the property referred to by the conspirators, and others at the Charity, as "the Lake House," located at 157 County Road 1163, in Eureka Springs, Arkansas, which was owned by Entity B. The luxury lake-front property consisted of a 5,292 square foot house with multilevel decks, and included a two-slip private boat dock; it was situated on a limestone bluff, with a 20-foot waterfall leading to a water garden. The property also included small cabin that was included in the rent by the Charity.

9

From January 2014 through June 2015, the conspirators caused the Charity to pay a total of $63,050 to Cranford as rent on two parcels of real estate unrelated to the Charity's mission:

a. The property located at 2004 Boca Chica, in North Port, Florida—a 1,858 square foot home with 3 bedrooms, 2 bathrooms and an in-ground swimming pool. The home was a 20-minute drive to Charlotte Harbor, Florida and a 30-minute drive to Venice Beach, Florida; and

b. Cranford's childhood home, which was located at 9780 Texas 77, in Douglassville, Texas.

*v. The conspirators caused the Charity to purchase recreational real estate from Entity B.*

In April 2015, the conspirators caused the Charity to pay a total of $1,853,000 to Entity B to purchase the Mountain House, the Lake House, and "the Lake Hut"—a smaller parcel and house adjoining the Lake House property that Person #3 transferred to Entity B—broken down as follows:

a. Entity B sold the Mountain House to the Charity for $998,000. Two months prior to the sale, the outstanding loan balance on the property was $693,290.41. The RT refinanced the note and added $306,472.81 to the balance, which the bank sent directly to the Charity that to repay a portion of the debt owed to the Charity by Entity B. By inflating the price of the bank note the conspirators caused the Charity to cancel Entity B's debt to the Charity, which inured to the benefit of Person #1, Person #2, Person #3, NOBLE, and one other.

b. Entity B sold the Lake House and Lake Hut to the Charity for $855,000. To obtain approval for the transactions, the conspirators misled the Charity's Board of Directors regarding the loan balance of the Lake Hut, by stating that was part of the Lake House property and was "owned free and clear," when in truth and in fact a loan balance then existed of over $100,000 and the Lake Hut was a separately deeded property.

*vi. Other theft, embezzlement and misapplication*

The conspirators stole, embezzled, and misapplied the Charity's funds through a variety of other schemes and artifices, including: personal services; charter air flights for commuting, personal, family, and pet travel; personal use of charity-provided vehicles; excessive Charity payment of travel expenses not reported as compensation; Charity payment of personal expenses not reported as

compensation; Charity-provided premium tickets to sporting events; theft and kickback arrangements.

>    *vii.  The conspirators caused the Charity to misapply funds for substantial, undisclosed lobbying and political advocacy, political campaign contributions, and to bribe public officials.*

The conspirators caused the Charity to misapply funds for substantial, undisclosed lobbying and political advocacy, monetary and in-kind contributions to the campaigns of candidates for public office, and to bribe public officials—thereby jeopardizing the Charity's tax-exempt status in order to increase revenue, so they had more funds available from which to embezzle and steal.  To provide a veneer of legitimacy for the unlawful payments to others, kickbacks paid to themselves, and to disguise the nature and source of the payments, the conspirators caused the Charity's books and records to misrepresent, conceal, and cover up the nature of the services provided by elected public officials, lobbyists and advocates, and financial contributions to elected public officials and their political campaigns, by falsely describing such payments being for training and consulting, and by causing the Charity to execute sham consulting agreements, training agreements, and agreements for other services.

<u>Lobbying and Political Advocacy</u>.  The conspirators caused the Charity to misapply its funds to pay for lobbying, which they concealed from the IRS and did not disclose on the Charity's Forms 990.  Moreover, the conspirators caused the Charity to misapply its funds for political advocacy, including lobbying in violation of the restrictions on organizations receiving public funds (meaning, expending appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement), and which they concealed from and did not disclose to the agencies awarding grants and contracts.  The conspirators caused the Charity to expend resources for lobbying and political advocacy, including:

>    a.  Substantial work performed by Person #3, who in addition to holding the title of Chief Executive Officer supervised government relations for the Charity and directly lobbied legislators.  Between 2005 and 2016, Person #3's annual compensation package, as reported on the Charity's IRS Forms 990 grew from $39,000 to $815.326.61.

b. Payments to "Lobbying Firm D," in Jefferson City, Missouri, totaling approximately $873,752 from October 2008 to June 2017.

c. Payments to The Cranford Coalition, totaling approximately $2,893,989 from January 2010 to April 2017 (excluding the $613,600 Cranford kicked back to Person #1).

d. Payments to Donald Andrew Jones, totaling approximately $456,000 from January 2012 to December 2016 (excluding the $264,000 Jones kicked back to Cranford and Cooper).

e. Payments to "Person #18"—who was a member of the Charity's Board of Directors and also a lobbyist registered with the State of Oklahoma—totaling approximately $458,575 from September 2008 to May 2017.

Political Campaign Contributions. Person #1, Person #2, Person #3, and Cranford caused the Charity to contribute financially to the campaigns of candidates for public office through "straw donors" including the Charity's lobbyists, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly. Frequently, the conspirators caused the Charity to reimburse its lobbyists by way of invoices falsely describing the expenses as "training" and "consulting." Additionally, Person #1, Person #2, and Person #3 encouraged some Charity employees to contribute to candidates for public office and caused the Charity to reimburse them for those contributions by providing funds described as reimbursement for travel or other expenses the employees had not actually incurred. The making of illegal campaign contributions was an integral part of the Charity's political operations, and regularly, Person #1, and Person #3 discussed the Charity's "budget" for campaign contributions—which was not a budget category in the Charity's books and records.

Organizing and Paying For Candidates' Fund-Raising Events. The conspirators caused the Charity to provide in-kind contributions to the campaigns of candidates for public office, which were prohibited by law since the Charity was a tax-exempt organization.

In Arkansas, Cranford, Cooper and others organized fundraisers for many candidates running for seats in the Arkansas State Senate and Arkansas House of Representatives. At Cranford's direction, "Employee D" prepared and disseminated invitations for the events, which were often held at venues such as restaurants and hotels in Little Rock, Arkansas. Cranford, Cooper and others paid for expenses related to the fundraisers using their Charity-issued corporate credit cards.

12

In Missouri, at the direction of Person #3 and Person #1, "Employee H" organized fundraisers for several candidates running for seats in the Missouri State Senate, Missouri House of Representatives, and the Greene County Commission. At the direction of Person #3, Employee H prepared and disseminated invitations to these fundraising events using the Charity's resources. At the direction of Person #3, Employee H arranged for catering, liquor, decorations, and other food, all purchased using his/her Charity-issued corporate credit card. NOBLE was listed as a host for at least two of the fundraising events:

a. On September 7, 2010, Person #1, Person #2, Person #3, NOBLE, Person #16 and two others hosted a fundraiser for "Missouri Senator B," who was then a candidate for the Missouri State Senate. This event was held at the home of Employee H. Expenses related to the reception were paid by Employee H, using the Charity's corporate credit card.

b. On March 15, 2012, the Charity's Board of Directors held a meeting at Employee H's condominium building, in conjunction with a fundraiser for Missouri Representative A, who was then a candidate for the Missouri State Senate. The fundraiser, held at Employee H's residence, was hosted by Person #1, Person #2, Person #3, NOBLE, and four others. Employee H prepared and disseminated invitations for the fundraiser as part of his/her job duties at the Charity.

Bribes. Person #1, Person #2, Person #3 and Cranford offered and gave things of value to numerous public officials, in exchange for their official actions benefitting the Charity and themselves personally, including: travel and entertainment not reported on IRS Forms 990, including premium tickets to sporting events, hotel accommodations, and use of the Charity's luxury/recreational real estate; hiring public officials and family members of public officials as Charity employees; disguising bribes as contract payments for things such as consulting, training, and legal services; and cash.

### viii. False Certifications on Grant Applications.

NOBLE supervised much of the grant-writing process for the Charity, and was actively involved in the drafting, submission, award, and oversight for programs involving federal grants and contracts. The Charity's grant-writing process was a collaborative one, involving Charity employees who identified grants and Requests for Proposals ("RFPs") for submission, drafted general outlines, and tracked the progress of applications, others who worked as grant writers, others who were subject matter experts, service providers, and members of the RT. Tasks

were assigned to individual employees based on their knowledge and expertise, and tracked on a spreadsheet. The final drafts of applications for government grants and contracts were reviewed by a member of the RT—most often, NOBLE, Person #2, and/or Person #3, and then signed and submitted by a Charity employee—either in hard copy format, or electronically by an employee with access to the electronic submission system on the United States Government web portal, https://www.grants.gov. Regularly, the Charity listed NOBLE as the point of contact for grant issues on grant applications and RFP submissions which he authorized and for which he had oversight.

In accordance with Title 29, Code of Federal Regulations (CFR), Part 93—Appendix A, each Charity application for a federally-funded grant or contract contained the required Certification Regarding Lobbying:

> No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

In all cases, the conspirators caused the Charity to submit applications that by their submission falsely certified the Charity's compliance with Federal law. Further, because failure to do so would have result in the loss of revenue and drawn the attention of regulatory authorities and law enforcement to the conspirators' misapplication of funds for political advocacy, in most cases the Charity falsely certified a Standard Form-LLL was not required by inserting "NA" or "N/A" (abbreviations for "not applicable") into the Attachment blank for the Standard Form-LLL, and signing the contract, including the certification. With some applications, the Charity did submit a Standard Form-LLL, which instead of disclosing the Charity's substantial use of appropriated federal funds—the major source of its revenue—for payments to Cranford, Jones, and others to influence agencies and departments in the award of federal grants and contracts, listed a different lobbying firm that had been used by the pre-merger Kirksville-based Preferred Family Healthcare, Inc.

On or about August 6, 2009, NOBLE supervised the Charity's preparation of a form entitled, "Application for Federal Assistance SF-424," for funds administered by the United States Department of Health and Human Services under solicitation number HHS-2009-CMS-CHIPRA-0008, the Children's Health

Insurance Program Reauthorization Act ("CHIPRA"), Outreach and Enrollment Grants Cycle I. The first page of the Charity's application, entitled "Children's Health Insurance Program Outreach and Enrollment Grant – CHIPRA Coverage Expansion in Southern Missouri," listed NOBLE as the Charity's primary point of contact, and "Person #11" signed the application on behalf of Person #3, who was listed as the Charity's authorized representative. The Charity's application packet contained a form entitled "Disclosure of Lobbying Activities," also signed by Person #11, on behalf of Person #3, which falsely certified the Charity's compliance with the requirements of Title 31, United States Code, Section 1352; specifically, the application falsely certified that no Federal appropriated funds had been paid or would be paid, by or on behalf of the Charity, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. Further, in response to item 10a, requiring disclosure of the name and address of lobbying registrant, the application stated "N/A" (an abbreviation for "not applicable"), and in response to item 10b, requiring disclosure of the individual performing lobbying services if different from the response to item 10a, the application also stated "N/A." However, in truth and in fact, as NOBLE, Person #3, and Person #11 each then well knew, the Charity employed lobbyists to influence members of Congress and their staffs, and officers and employees of Federal agencies, regarding Federal contracts and grants.

D.     Defendant's Plea to the Information

By pleading guilty to the Information, the defendant admits and acknowledges that from at least as early as 2005, and continuing through at least June 30, 2017, Person #1, Person #2, Person #3, and others, conspired and agreed with each other, to execute a scheme whereby Person #1, Person #2, and Person #3, being agents of the Charity, an organization receiving in each one-year period from July 1, 2005, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly misapplied and converted to their use, property worth at least $5,000 and under the care, custody, and control of such organization, namely millions of dollars in funds, in violation of Title 18, United States Code, Section 666(a)(1)(A).

Further, the defendant admits and acknowledges he knew of the commission of the felony offense described above. Because Person #1, Person #2, and Person #3 excluded the defendant from most decision-making regarding the financial operations of the Charity, the defendant maintains—and the Government

15

agrees—NOBLE did not know the details of the many embezzlement and misapplication of funds schemes perpetrated by Person #1, Person #2, Person #3, and others. However, the defendant acknowledges he knew at the time that many of the schemes concocted by the conspirators, such as the sale of Entity A to Company A, were perpetrated for the primary purpose of enriching the Resource Team, including himself. Further, the defendant acknowledges he knew at the time that the Charity bore additional cost from many of those transactions, such as the management agreements executed by the Charity preceding the sale of Entity A to Company A, and thus he knew Person #1, Person #2, and Person #3 were wrongfully taking the Charity's funds. Finally, the defendant admits that he willfully blinded himself regarding the details of the conspirators' schemes and artifices to defraud the Charity, meaning he deliberately closed his eyes to what otherwise would have been obvious to him, and acknowledges that as a matter of law his willful blindness establishes his knowledge of the facts set forth.

Further, the defendant admits and acknowledges that despite his fiduciary duty as an executive of the Charity, he did not inform the Board of Directors of the conspirators' embezzlement and misapplication of Charity funds, nor did he as soon as possible make known the same to law enforcement officers, or any other person in civil authority.

Finally, the defendant admits and acknowledges he aided in the preparation and presentation of an application for solicitation number HHS-2009-CMS-CHIPRA-0008, the Children's Health Insurance Program Reauthorization Act ("CHIPRA"), Outreach and Enrollment Grants Cycle I, filed with the United States Department of Health and Human Services on August 6, 2009, which he knew or should have known materially and falsely certified the Charity had not engaged in any lobbying activities, in violation of Title 18, United States Code, Section 4.

E.    Defendant's Gain

From 2005 through June 30, 2017, NOBLE received funds totaling **$4,323,107.30**, which were the proceeds of the conspirators' embezzlement, theft, misapplication and unlawful conversion of Charity funds and property, as set forth below, which amount the defendant agrees to pay to the United States in restitution, as specified in Paragraph 6 of this plea agreement.

i.    NOBLE's share of the proceeds from the sale of Entity A to Company A:

| Date | Description | Amount |
|------|-------------|--------|
| 04/26/2006 | Original negotiated price | $ 200,000.00 |
| 05/09/2007 | First earn-out from Company A | $ 1,546,008.00 |
| 04/08/2008 | Second earn-out from Company A (cash) | $ 1,667,646.56 |
| | Second earn-out from Company A (stock) | $ 555,882.19 |
| | **Total:** | **$ 3,969,536.75** |

ii.  Checks to NOBLE from Entity C and Entity B:

| Check # | Written Date | Payor | Amount |
|---------|-------------|-------|--------|
| 2280 | 10/15/2012 | Entity C | $ 5,000.00 |
| 2387 | 10/15/2012 | Entity B | $ 10,000.00 |
| 2455 | 01/01/2013 | Entity B | $ 50,000.00 |
| 4040 | 05/17/2013 | Entity C | $ 20,000.00 |
| 4185 | 12/16/2013 | Entity C | $ 15,000.00 |
| 2692 | 12/16/2013 | Entity B | $ 5,000.00 |
| 4410 | 12/31/2014 | Entity C | $ 15,000.00 |
| 2944 | 03/20/2015 | Entity B | $ 33,050.79 |
| 2955 | 04/16/2015 | Entity B | $ 50,000.00 |
| 4535 | 04/16/2015 | Entity C | $ 100,000.00 |
| 4452 | 12/31/2015 | Entity C | $ 38,019.76 |
| 2993 | 04/10/2017 | Entity B | $ 12,500.00 |
| | | **Total:** | **$ 353,570.55** |

4.  **Use of Factual Admissions and Relevant Conduct.**  The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2).  The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

17

5. **Statutory Penalties.** The defendant understands that, upon his plea of guilty to the single-count Information, charging him with violation of **18 U.S.C. § 4**, that is, **Misprision of Felony**, the maximum penalties the Court may impose are 3 years' imprisonment, 1 year of supervised release, a fine of $250,000 (or twice the amount of the gross gain or gross loss, whichever is greater), an order of restitution, and a $100 mandatory special assessment, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class E felony.

6. **Agreed Restitution.** Pursuant to 18 U.S.C. § 3663(a)(3), the Government and the defendant stipulate and agree the defendant will pay restitution to the United States Treasury in the amount of **$4,323,107.30**, less credit for amounts the defendant paid to the Treasury in taxes on the proceeds of the criminal scheme, as calculated by the United States in its sole discretion. The defendant agrees to furnish income tax returns and financial records to the United States within 10 days of the entry of this plea, to enable the United States to make this calculation, and understands and acknowledges that the United States' computation is not subject to appeal. The defendant agrees to pay this restitution prior to sentencing, and the United States agrees to recommend that no fine, additional restitution, or other monetary penalty be ordered.

7. **Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable."

    b. The Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing.

18

c. In addition to a sentence of imprisonment, the Court may impose a term of supervised release of **up to one year**; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed.

d. If the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of **up to one year** without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed **one year**, less the term of imprisonment imposed upon revocation of the defendant's first supervised release.

e. The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range.

f. Any sentence of imprisonment imposed by the Court will not allow for parole.

g. The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office.

h. The defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

8. **<u>Government's Agreements</u>.** Based upon evidence in its possession at this time, the United States, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the Information for which it has venue and which arose out of the defendant's conduct described above. **Additionally, the Government agrees that it will not oppose the defendant's request for a sentence of Probation**.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against

19

the Person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the United States elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

9.  **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve

the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

10. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that, if the Court accepts his pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his pleas of guilty.

11. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

      a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

      b. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

c.     The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, will be used to calculate the defendant's Guidelines range.

12.     **Effect of Non-Agreement on Guidelines Applications.**     The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

13.     **Change in Guidelines Prior to Sentencing.**     The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option.  If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

14.     **Government's Reservation of Rights.**     The defendant understands that the United States expressly reserves the right in this case to:

a.     oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

b.     comment on the evidence supporting the charges in the information;

c.     oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

22

   d.  oppose any post-conviction motions for reduction of sentence, or other relief.

  15. **<u>Waiver of Constitutional Rights</u>.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

   a.  the right to plead not guilty and to persist in a plea of not guilty;

   b.  the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

   c.  the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

   d.  the right to confront and cross-examine the witnesses who testify against him;

   e.  the right to compel or subpoena witnesses to appear on his behalf; and

   f.  the right to remain silent at trial, in which case his silence may not be used against him.

  The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to felony offenses and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

Case 6:18-cr-03097-MDH Document 10 Filed 09/11/18 Page 23 of 28

16. **Waiver of Appellate and Post-Conviction Rights.**

      a.      The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

      b.      The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

17. **Waiver of Statute of Limitations.** The defendant acknowledges he understands the statute of general application, Section 3282 of Title 18, United States Code, applies to the offense charged in the Information, and further acknowledges he understands the offense charged in the Information took place outside of the applicable five-year limitations period. By entering into this plea agreement, the defendant hereby waives any challenge to the Information based on the fact that the instant prosecution was not instituted within five years after the charged offense was committed.

18. **Discovery Waiver.** The defendant waives the right to any further discovery or disclosures of information not already provided at the time of the entry of the guilty plea, other than information required to be disclosed under Federal Rule of Criminal Procedure 32(i)(2) and exculpatory or impeachment information casting doubt upon sentencing factors.

19. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

24

a.     The Court must order restitution to the victims of the offense to which the defendant is pleading guilty.  The defendant agrees that the Court may order restitution in connection with all other uncharged, related criminal activity.

b.     The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

c.     The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party.  The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

d.     Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit:  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

e.     At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

f.     The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g.     The defendant understands that a Special Assessment will be imposed as part of the sentence in this case.  The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case.  The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h.     The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations.  Moreover, the defendant promises that he will make no such transfers in the future.

i.      In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

20.     **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

21.     **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

22.     **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his pleas of guilty.

26

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

23. **Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his pleas of guilty.

24. **No Undisclosed Terms.** The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

25.   **Standard of Interpretation.**   The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TIMOTHY A. GARRISON
United States Attorney, Western District of Missouri

Dated:   _9/10/18_____   By:   _/s/ Steven M. Mohlhenrich_____
STEVEN M. MOHLHENRICH
Assistant United States Attorney

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the information.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines.  I have read this plea agreement and carefully reviewed every part of it with my attorney.  I understand this plea agreement and I voluntarily agree to it.

Dated:   _9/11/18_____   _/s/ Keith Fraser Noble_____
KEITH FRASER NOBLE
Defendant

I am defendant Keith Fraser Noble's attorney.  I have fully explained to him his rights with respect to the offense charged in the information.  Further, I have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case.  I have carefully reviewed every part of this plea agreement with him.  To my knowledge, Keith Fraser Noble's decision to enter into this plea agreement is an informed and voluntary one.

Dated:   _9/11/18_____   _/s/ Teresa Grantham Fiester_____
TERESA GRANTHAM FIESTER
Attorney for Defendant

28

Case 6:18-cr-03097-MDH   Document 10   Filed 09/11/18   Page 28 of 28